Miguel A. Estrada (*pro hac vice* application forthcoming)
Audi K. Syarief (*pro hac vice* application forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
Telephone:  (202) 955-8257
Facsimile:  (202) 530-9616
mestrada@gibsondunn.com

Marshall R. King (N.J. Bar No. 023301991)
  *Attorney of Record*
Andrea E. Neuman (*pro hac vice* application forthcoming)
Rahim Moloo (*pro hac vice* application forthcoming)
Casey Kyung-Se Lee (*pro hac vice* application forthcoming)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-3905
Facsimile:  (212) 351-5243
mking@gibsondunn.com
aneuman@gibsondunn.com
rmoloo@gibsondunn.com
clee@gibsondunn.com

*Counsel for Plaintiff North American Sugar Industries Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORTH AMERICAN SUGAR INDUSTRIES INC., <br><br> Plaintiff, <br><br> v. <br><br> DSV AIR & SEA INC., <br><br> Defendant. | Civil Action No. 2:21-cv-00080 |

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiff North American Sugar Industries Inc. ("American Sugar"), a New Jersey corporation with its principal place of business in New York, New York, for its complaint against defendant DSV Air & Sea Inc. ("DSV"), a Delaware corporation with its principal place of business located at 100 Walnut Avenue, Suite 405, Clark, New Jersey 07066, in the above-captioned action, alleges on information and belief as follows:

## **NATURE OF ACTION**

1.      American Sugar brings this action under the Helms-Burton Act[1] to recover treble damages and interest totaling hundreds of millions of dollars resulting from DSV's deliberate and unlawful trafficking of American Sugar's expropriated property in Cuba for its own financial gain.  DSV's misuse of American Sugar's confiscated property—certified by the United States to be worth hundreds of millions of dollars today—without a speck of compensation is precisely the type of harm that the Helms-Burton Act was enacted to redress.

2.      For over 50 years, up until the Cuban Revolution, American Sugar owned and operated a thriving business in Cuba producing, refining, and transporting raw sugar.  Through itself and numerous Cuba-based subsidiaries, American Sugar owned and maintained a diverse array of assets for its expansive business operations:  land and crops, farm buildings, power-generation systems, a railroad, and most pertinent here, large commercial shipping ports—including one dubbed "Puerto Carupano."

3.      American Sugar's lucrative business did not go unnoticed by the regime formed in the aftermath of the Cuban Revolution.  Within about a year, from 1959 to 1960, the Cuban government destroyed American Sugar's business, expropriating its assets in Cuba without a penny of compensation for this illegal and unjust expropriation.

4.      Since then, the Cuban government has used American Sugar's confiscated property to further its own ends, including permitting for-profit businesses such as DSV to use and benefit from that property.  DSV, which is engaged in the shipping/transportation business, used Puerto Carupano (and/or financially benefited from others' use of that port) to deliver

---

[1]  Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 (codified at 22 U.S.C. §§ 6081–85).

equipment for use in the Herradura Wind Farm Project—the largest wind power project in Cuba, with a price tag in the hundreds of millions of dollars—located just 15 miles away.

5.       Specifically, suppliers to the Herradura Wind Farm Project shipped wind farm equipment to Puerto Carupano in early 2019 for the benefit of a Cuban state-owned entity associated with the project.  DSV provided transportation, logistical, and export-related services in support of these shipments of equipment.  DSV knew full well that it could be required to compensate American Sugar under the Helms-Burton Act for using and/or benefiting from the use of Puerto Carupano.

6.       DSV did not act alone.  To plan and execute these shipments to Puerto Carupano, DSV acted in concert with its corporate affiliates, and conspired with other companies providing transportation and logistical services and with the suppliers and recipients of the wind farm equipment.  Together, these companies implemented the pickup of the wind farm equipment in China, an interim stop in the United States to comply with certain U.S. trade law requirements other than the Helms-Burton Act, and the unloading of the equipment at Puerto Carupano.  Each of these steps required coordination among the companies engaged in this commercial shipping enterprise, and the involvement of local actors and government authorities.

7.       Sixty years after its business was stolen, American Sugar still has received nothing for its confiscated property, while the Cuban government and private companies such as DSV continue to traffic in and use American Sugar's expropriated property for their own profit, including (but not limited to) supplying a multi-hundred-million-dollar wind farm project.  To be sure, in the wake of the Cuban government's actions, the United States established an administrative process for claims against the Cuban government, and certified in 1969 that American Sugar suffered losses equal to just over $97 million—the second-largest claim against

the Cuban government ever certified by the United States.  That process, however, did not authorize American Sugar to seek damages against the Cuban government or those who, like DSV, use American Sugar's property for their own gain in concert with the Cuban government.

8.      To redress this problem, in March 1996, President Clinton signed into law the Helms-Burton Act.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic[]" in property expropriated by the Cuban government.  Title III defines "trafficking" broadly to prohibit even the mere "use" of or "benefiting from" expropriated property.  And where (as in this case) the U.S. government has certified a person's claim to ownership of expropriated property, a trafficker is subject to treble damages if found liable, and faces a steep climb to avoid liability:  the certified claim is deemed conclusive proof of the claimant's ownership of the at-issue property, and the loss calculation set forth in the certified claim is the presumptive base damages amount to be trebled, rebuttable only by clear and convincing evidence.

9.      Although Title III's proscription against trafficking has remained in force since August 1996, the private right of action for Title III violations has been suspended by the President (pursuant to authority granted in the Act) up until only recently.  As required by the Act, this suspension was continuously revisited at least every six months.  The suspension of Title III's private right of action was partially lifted in March 2019, and then fully lifted in May of 2019.

10.     Persons trafficking in confiscated property after the enactment of the Helms-Burton Act did so at their own peril, even before the suspension of the private right of action was lifted.  Liability under the Act for such misconduct—especially where the United States had certified a claim for expropriated property in Cuba—was unmistakably clear; the suspension of

4

the private right of action was subject to repeated review and could be lifted in a matter of months; and the Act's two-year limitations period did not begin to run until the trafficking at issue stopped.  Moreover, traffickers who were natural persons also risked being denied entry into the United States under Title IV of the Act, which has remained in full effect since March 1996.

11.      Accordingly, companies like DSV have known since 1996 that having business dealings with Cuba, and (among other things) using or benefiting from confiscated property certified by the United States as originally belonging to American Sugar, or profiting from such use or benefit, carried the risk of steep liability under the Helms-Burton Act.  DSV nevertheless proceeded to traffic in American Sugar's property.  Now that the Act's private right of action is in force, American Sugar seeks long-overdue relief for the uncompensated exploitation of its confiscated property, including DSV's knowing and intentional use of that property for its own financial gain.

## JURISDICTION AND VENUE

12.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

13.      Subject matter jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367(a), because American Sugar's civil conspiracy claim is "so related" to its Helms-Burton Act claim that they "form part of the same case or controversy under Article III of the United States Constitution."

14.     As required under Title III of the Helms-Burton Act, the amount in controversy in this action exceeds $50,000, exclusive of compounded interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

15.     Personal jurisdiction is conferred upon this Court because DSV's principal place of business is located in Clark, New Jersey.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because DSV resides in this district.  Alternatively, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because DSV is subject to the Court's personal jurisdiction with respect to this action.

17.     Contemporaneous with this filing, American Sugar has paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES

18.     Plaintiff American Sugar, originally known as the Cuban-American Sugar Company, is a United States national and a corporation organized and existing under the laws of the state of New Jersey since September 19, 1906, with its principal place of business in New York, New York.  From its incorporation, American Sugar owned and operated significant commercial operations in Cuba relating to the production, refining, and transportation of raw sugar.  These operations were forcibly terminated in 1959 and 1960 when the Government of Cuba expropriated the underlying Cuban assets.

19.     Defendant DSV is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 100 Walnut Avenue, Suite 405, Clark, New Jersey 07066.  DSV provides air and sea freight forwarding services, including transport,

warehousing, and logistics services.  DSV is an affiliate of DSV Ocean Transport A/S ("DSV

Ocean Transport") and DSV Air & Sea A/S ("DSV Air & Sea"), both Danish corporations that

similarly provide sea freight-forwarding services.  The parent company of all three entities is

DSV Panalpina A/S, a Danish corporation whose current market capitalization is approximately

$37.7 billion.  In 2018, DSV operated and maintained 35 branch offices throughout the United

States, including one office in Miami, Florida.

## STATUTORY BACKGROUND

### I.        Certification by the U.S. Foreign Claims Settlement Commission

20.        On February 3, 1962, in response to the rise of Fidel Castro and Cuba's

Communist Revolution, President John F. Kennedy issued Proclamation 3447, Pres. Proc. No.

3447, 76 Stat. 1446, which established a comprehensive trade embargo in order to pressure Cuba

to implement democratic reforms.  This trade embargo remains substantially in force today.

21.        Building on the Cuban trade embargo, and in response to (among other things) the

Castro regime's expropriation of Cuban property belonging to U.S. nationals, on October 16,

1964, Congress enacted Title V of the International Claims Settlement Act of 1949 ("ICSA"),

Pub. L. 88-666, 78 Stat. 1110 (1964) (codified at 22 U.S.C. §§ 1643–1643k (1964)) which

established the Cuba Claims Program to be administered by the United States Foreign Claims

Settlement Commission ("FCSC").

22.        The Cuba Claims Program was limited to expropriation and similar claims against

the Cuban government that arose between January 1, 1959 and October 15, 1964.  The program

was closed on July 6, 1972.

23.        The FCSC is an independent federal agency that determines the validity and

amount of each claim of expropriation that United States nationals have against a foreign

government, so that those nationals may be compensated for their losses and injuries pursuant to

specific programs authorized by law. *See* Reorganization Plan No. 1 of 1954, 68 Stat. 1279 (1954).

24.     Under the Cuba Claims Program, the FCSC "receive[d] and determine[d] in accordance with applicable substantive law, including international law, the amount and validity of claims by *nationals of the United States* against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of . . . *property* including any rights or interests therein owned wholly or partially, directly or indirectly at the time *by nationals of the United States*." 22 U.S.C. § 1643b(a) (emphases added).

25.     The term "nationals of the United States" includes "persons who are citizens of the United States" and "persons who, though not citizens of the United States, owe permanent allegiance to the United States." 22 U.S.C. § 1621(c).

26.     The term "property" is defined as "any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba . . . or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba . . . ." 22 U.S.C. § 1643a(3).

27.     In determining the value of an expropriation claim, the FCSC was required to take "into account the basis of valuation most appropriate to the property and equitable to the claimant, including, but not limited to, (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement." 22 U.S.C. § 1643b(a).

28.     Upon completion of its review of an expropriation claim, the FCSC "certif[ied] to each individual who has filed a claim . . . the amount determined by the Commission to be the loss or damage suffered by the claimant . . . . The [FCSC] shall certify to the Secretary of State

such amount and the basic information underlying that amount, together with a statement of the evidence relied upon and the reasoning employed in reaching its decision." 22 U.S.C. § 1643f(a).

29.     ICSA originally contemplated that the Secretary of State would use these certified claims to negotiate and enter into a potential settlement agreement with the Cuban government, whereby the Cuban government would compensate U.S. nationals with certified expropriation claims.  Instead, as discussed below, the Helms-Burton Act deems the amount of an FCSC-certified claim to be the damages—before compounded interest, treble damages, court costs, and reasonable attorneys' fees—owed to a plaintiff that prevails in a private right of action brought under the Act.

## II.     The Helms-Burton Act

### A.     Background

30.     On March 12, 1996, President Clinton signed the Helms-Burton Act into law, not only to further strengthen international sanctions and the trade embargo against the Government of Cuba, 22 U.S.C. § 6022(2), but also to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C. § 6022(6).

31.     Congress recognized that international law, as then structured, "lacks fully effective remedies" for the "unjust enrichment *from the use of wrongfully confiscated property by* governments and *private entities* at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8) (emphases added).

32.     According to Congress's findings, this "'trafficking' in confiscated property provides badly needed financial benefit . . . to the Cuban government and thus undermines the foreign policy of the United States," which includes "protect[ing] claims of United States

nationals who had property wrongfully confiscated by the Cuban government." 22 U.S.C. § 6081(6).

33.     "To deter trafficking," Congress found that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).

34.     To this end, Title III of the Helms-Burton Act, entitled "Protection of Property Rights of United States Nationals," imposes liability on persons trafficking in property confiscated from a U.S. national by the Cuban government on or after January 1, 1959, and authorizes a private right of action for damages against such traffickers. *See* 22 U.S.C. § 6082.

35.     A Title III lawsuit may not be brought more than two years after the trafficking giving rise to the lawsuit has ceased to occur. *See* 22 U.S.C. § 6084.

36.     The Helms-Burton Act authorizes the President to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b). The President has historically delegated this suspension authority to the Secretary of State.

37.     On July 16, 1996, President Clinton suspended the private right of action under Title III for six months. The August 1, 1996 effective date, however, was not suspended.

38.     On August 1, 1996, Title III of the Act came into effect. Starting on that date, traffickers of confiscated property were liable to U.S. nationals with certified claims to that property but could not be sued while the private right of action remained suspended.

39.     Because the operative provisions of the Act became effective and have remained continually in full force and effect since 1996, traffickers in confiscated property had no

10

assurances that they would be forever shielded from liability by a President's discretionary suspension of the private right of action, which could be reinstated at any time, triggering civil liability for any violation of the Act within the two-year limitation period. Thus, in the event that the suspension was lifted, trafficking from up to two years prior could be the subject of a lawsuit.

40.     President Clinton and subsequent administrations continuously renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President and Secretary of State.

41.     On March 19, 2019, Secretary of State Pompeo partially lifted the suspension of Title III's private right of action, allowing United States nationals to sue certain Cuban state-owned entities. Then on May 2, 2019, Secretary Pompeo fully lifted the suspension. In remarks addressing this action, Secretary Pompeo stated that "a chance at justice" would now be offered to those who have "long sought relief for Fidel Castro and his lackeys seizing property without compensation."[2]

42.     While traffickers in confiscated property have been—until recently—unreachable by Title III lawsuits, they have been subject to potential consequences since March 12, 1996. Under Title IV of the Act, the Secretary of State "shall deny a visa to, and the Attorney General shall exclude from the United States any alien who the Secretary of State determines is a person who has traffic[ked] in confiscated property." 22 U.S.C. § 6091(a). Indeed, this denial and exclusion applies to not only the trafficker in question, but also to the trafficker's agents, corporate officers, principals, and controlling shareholders. *See id.*

---

[2] Michael R. Pompeo, Secretary of State, Remarks to the Press (Apr. 17, 2019), https://cu.us embassy.gov/remarks-to-the-press-3/.

43.     In response to the Helms-Burton Act, the Cuban government enacted Act No. 80, the "Reaffirmation of Cuban Dignity and Sovereignty Act," sanctioning, and potentially criminalizing, "any form of collaboration, direct or indirect, which favors the application of the Helms-Burton Act," including supplying information to an individual for possible application of the Act or assisting another person in supplying such information.  Ley No. 80, Arts. 8–9, Gaceta Oficial No. 2 Extraordinaria, 299–300 (1996).  The evident purpose of Act No. 80 is to hinder the investigation and prosecution of violations of the Helms-Burton Act by those with potential claims under the Act.

**B.     The Helms-Burton Act's Private Right of Action**

44.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking.—(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages. . . .

22 U.S.C. § 6082(a)(1).

45.     The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state."  22 U.S.C. § 6023(11).

46.     The Act defines "United States national" to include any "legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States."  22 U.S.C. § 6023(15).

47.     A person "traffics" in confiscated property if that person "knowingly, and intentionally":

(i)  sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains

control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

48.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest."  22 U.S.C. § 6023(12).

49.     The Act defines "confiscated" in relevant part as "the nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure." 22 U.S.C. § 6023(4)(A).

50.     The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

51.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of

13

an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

### C.     Remedies Under the Helms-Burton Act's Private Right of Action

52.     A person who "traffics" in a United States national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i) the amount which is *the greater of*—

(I) *the amount, if any, certified to the claimant by the [FCSC] under the [ICSA], plus interest*;

(II) the amount determined [by a court-appointed special master, which may include the FCSC], plus interest; or

(III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A) (emphases added).

53.     Interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought." 22 U.S.C. § 6082(a)(1)(B). This interest is calculated pursuant to 28 U.S.C. § 1961 "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

54.     A person who "traffics" in a United States national's confiscated property under the Act is also liable for a plaintiff's court costs and reasonable attorneys' fees. *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

55.     In addition, the Helms-Burton Act adopts "a presumption that the amount for which a person is liable . . . is the amount that is certified [by the FCSC under the ICSA]." 22 U.S.C. § 6082(a)(2). That presumption is only "rebuttable by clear and convincing evidence."

*Id.* A court must also "accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC under the ICSA]." 22 U.S.C. § 6083(a)(1).

56.     Further, the Act provides that "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages to a United States national who owns a certified claim to that property. 22 U.S.C. § 6082(a)(3)(A), (C).

57.     Congress intentionally conferred these presumptions to certified claims. The Report from the Conference Committee states that "courts shall give a strong presumption to the findings of the FCSC" and further states:

> The committee of conference recognizes the importance of a decision by the Foreign Claims Settlement Commission in certifying a claim and, accordingly, believes that no court should dismiss a certification in an action brought under [Title III]. The committee of conference also notes the recognized special expertise of the FCSC in determining the amount and validity of claims to confiscated properties overseas.

H.R. Rep. No. 104-468, at 63 (1996).

## FACTUAL ALLEGATIONS

### I.     Cuba's Expropriation of American Sugar's Property

#### A.     American Sugar's Property in Cuba

58.     When it was initially incorporated in 1906, American Sugar held five sugar-producing companies that owned and operated large commercial shipping ports, raw sugar mills, cane land, and a cane sugar refinery in Cuba. Over the ensuing several decades, American Sugar greatly expanded operations in Cuba, and by 1959 and 1960 it came to hold not only two of the largest raw sugar mills in the world at that time but also two shipping ports integral to its sugar mill operations and various other assets.

59.     American Sugar's property in Cuba (the "Confiscated Property") consisted of various Cuban corporate subsidiaries and their numerous assets across Cuba, including large commercial shipping ports, land and crops, farm buildings, raw sugar mills, power-generating equipment, a railroad, and a sugar refinery.  American Sugar's raw sugar mills, known as Central Mercedita, Central Chaparra, and Central Delicias, were notable for their productivity and high output.  Central Mercedita produced 30,000 tons of sugar in 1959.  Centrals Chaparra and Delicias, which comprised about 300,000 acres of land, produced 250,250 tons of sugar in 1959—and, together, ranked in the top 10 sugar producers in all of Cuba.  The high output and efficient processes were due to American Sugar's substantial investment in the maintenance and modernization of the raw sugar mills, and the related equipment and infrastructure.  Exhibit 1 (attached hereto) includes a more detailed description of the Confiscated Property and its value.

60.     The Confiscated Property also includes Puerto Carupano, a large commercial shipping port located in Cayo Juan Claro, which is in the Cuban municipality of Puerto Padre and the Cuban province of Las Tunas.  It is the only commercial shipping port in all of Puerto Padre.  Puerto Carupano is also referred to as "Port of Cayo Juan Claro," "Port of Carupano," or "Port of Puerto Padre."

61.     Puerto Carupano (hereinafter the "Confiscated Port") encompasses associated docks, warehouses, tanks, transportation facilities, pump houses, an electric substation, dwellings, barracks, office buildings, piers, shops, and other related installations.

62.     The Confiscated Port was critical to American Sugar's business operations in Cuba and abroad.  The port was a hub not only for transportation, storage, and shipping of all exported raw sugar and molasses produced by American Sugar at Centrals Chaparra and Delicias, but also for much of the imported heavy capital equipment, oil, merchandise, and food

for the surrounding area.  Because the port was adjacent to fertile lands housing two of American Sugar's largest raw sugar mills, American Sugar incurred minimal expenses in transporting its sugar products to the Confiscated Port for shipment.

**B.     Cuba Confiscates American Sugar's Property—Including the Confiscated Port**

63.     On January 1, 1959, as part of the Cuban Revolution, Fidel Castro took control of the Cuban government.  His administration immediately began promulgating a series of laws and resolutions that effectively confiscated virtually all private property in Cuba owned by United States nationals in various economic sectors.  The Cuban government made no effort to compensate United States nationals for expropriating their property, as required under generally accepted rules of international law.

64.     American Sugar was no exception to this mass seizure of private property.  The Cuban government's expropriation of the Confiscated Property began in 1959 and came to a head on July 20, 1960.  On that date, Cuba's National Agrarian Reform Institute issued Resolution No. 195, through which the Cuban government seized full control and ownership of the Confiscated Property.

65.     The Cuban government's expropriation of the Confiscated Property—without even a jot of compensation as required under generally accepted rules of international law, *see* Exh. 1 at 3—effectively terminated American Sugar's operations in Cuba.

66.     Upon seizing the Confiscated Port, the Cuban government openly and notoriously used, and continues to use, that port for its own commercial activities and those of private parties doing business with Cuba.

67.     On January 20, 1978, for example, Fidel Castro made a public speech at the Confiscated Port regarding a new bulk sugar terminal that had been built at the port.  Alluding to

the Cuban government's expropriation of commercial ports such as the Confiscated Port, Castro proudly proclaimed in the speech that the ports, which had been previously owned by "property owners and the capitalists," were now the "property of the [Cuban] people."[3]  He reiterated that the "ports [have] ceased to be operated by private enterprise."[4]

68.     In the 1980s, the Confiscated Port handled approximately 8% of Cuba's annual production of sugar and sugar byproducts, valued in excess of $370 million.  Products from the Central Chaparra mill and the Central Delicias mill—both confiscated from American Sugar— were routinely transported through the Confiscated Port.

69.     To this day, the Confiscated Port remains one of Cuba's key shipping ports and a hub of substantial commercial activity—much of which is in support of, or substantially related to, projects spearheaded by the Cuban government and its state-owned companies.  Indeed, the Cuban government has sought to encourage foreign investment by regularly touting the Confiscated Port as one of the country's principal shipping ports.[5]

70.     To this day, American Sugar has not received any compensation for the expropriation of the Confiscated Property, nor has any part of the Confiscated Property been returned to American Sugar.  Moreover, American Sugar's claim to the Confiscated Property has

---

[3]  *See* Fidel Castro, President of Cuba, *Dedication of bulk sugar terminal in Puerto Carupano*, LAS TUNAS PROVINCE (Jan. 20, 1978), *available at* http://lanic.utexas.edu/project/castro/db/1978/ 19780120.html.

[4]  *Id.*

[5]  *See, e.g.*, Cuba Ministry of Foreign Commerce and Investments, Cuba: Portfolio of Opportunities for Foreign Investment 2016–2017, at 204 (listing "Carupano" as one of 12 "Principal Cuban Ports"), *available at* https://arwtc.org/wp-content/uploads/2017/05/ Portfolio_Opportunities_Foreign_Investment_2016-2017.pdf (last visited Dec. 6, 2020).

never been settled by an international claims settlement agreement or other settlement agreement between the United States and Cuba.

### C.    American Sugar's Claim Is Certified in 1969 for Over $97 Million

71.    In response to the expropriation of its Confiscated Property and the resultant financial loss, American Sugar submitted a claim to the FCSC for determination under the Cuba Claims Program.  American Sugar's certified claim is publicly accessible[6] and has been the subject of news reports.[7]

72.    The FCSC found that American Sugar qualified as a "national of the United States" within the meaning of the ICSA.  *See* Exh. 1 at 2.

73.    The FCSC evaluated the value of American Sugar's claim by reviewing, among other things, a value appraisal, photographs, engineering surveys, maps, statements of noncapital assets, and a prior report submitted by American Sugar to the Department of State in 1961 asserting the values of the individual confiscated properties.  *See* Exh. 1 at 3.

74.    After an extensive review of the evidence regarding the value of the Confiscated Property, the FCSC "certifie[d] that [American Sugar] suffered a loss, as a result of actions of the Government of Cuba" in the amount of $97,373,414.72.  Exh. 1 at 21.

75.    The amount of American Sugar's loss certified under the Cuba Claims Program is the second-highest amount ever certified by the FCSC for an individual or entity.

---

[6]  *See* FCSC, Final Opinions and Orders, https://www.justice.gov/fcsc/final-opinions-and-orders-5 (last visited Dec. 6, 2020).

[7]  *See, e.g.*, Nick Miroff, *The 20 Largest U.S. property claims in Cuba*, WASH. POST, Dec. 8, 2015 (American Sugar has second-largest certified claim), *available at* https://www.washingtonpost.com/news/worldviews/wp/2015/12/08/the-20-largest-u-s-property-claims-in-cuba/.

76.     American Sugar's expropriation claim against the Government of Cuba regarding the Confiscated Property has never been settled pursuant to a settlement agreement between the United States and Cuba.

## II.     DSV's Deliberate Use of American Sugar's Confiscated Property

### A.     The Herradura Wind Farm Project

77.     The Confiscated Port has been the main artery for imports of (among other things) wind turbines, related equipment, structures, and other materials needed to build one of Cuba's largest ongoing public works projects:  the Herradura Wind Farm Project, which is located about 15 miles from the Confiscated Port.

78.     Indeed, the Cuban Ministry of Transportation published a news article regarding the Confiscated Port, which states that "[t]he technological equipment of the La Herradura 1 wind farm, which is built on the coast of the municipality of Jesús Menéndez, has entered through this port enclave and will continue to do so. . . ."[8]

79.     The Herradura Wind Farm Project is part of the Cuban government's publicized goal of significantly reducing its dependence on imported foreign oil.  By 2030, Cuba aims to produce almost a quarter of its electricity, or 2,269 megawatts ("MW") of energy, from renewable sources.  To support this shift to renewable energy, Cuba has secured an estimated $4 billion in foreign investment.

---

[8]  Periódico 26, Día del Trabajador Marítimo Portuario: En Puerto Carúpano al Jolgorio Después del Trabajo, MINISTERIO DEL TRANSPORTE, REPUBLICA DE CUBA (June 14, 2019), https://www.mitrans.gob.cu/es/noticias/dia-del-trabajador-maritimo-portuario-en-puerto-carupano-al-jolgorio-despues-del-trabajo (Original Spanish: "Por este enclave portuario ha entrado – y lo continuará haciendo – el equipamiento tecnológico del parque eólico La Herradura 1, que se edifica en el litoral del municipio de Jesús Menéndez . . .").

80.     Located in the Jesús Menéndez municipality of the Cuban province of Las Tunas, the Herradura Wind Farm Project is composed of two separate wind farms known as "Herradura 1" and "Herradura 2." Herradura 1 is set to house 34 wind turbines, whereas Herradura 2 is set to contain 20 wind turbines. The project is estimated to cost hundreds of millions of dollars to construct and is expected to generate 101 MW of energy into Cuba's central electrical grid— more than any other existing Cuban wind farm project, and a 61% increase in the renewable energy capacity in Cuba. A Cuban state official has stated that the project is estimated to save the Government of Cuba nearly 79,000 tons of fuel each year.[9]

81.     A host of Cuban state-owned entities are involved in the planning, construction, and implementation of the Herradura Wind Farm Project, including Empresa Importadora-Exportadora de Objetivos Electro-Energéticos ("Energoimport")—a component of Cuba's Ministry of Energy and Mining.

82.     Energoimport arranges the logistics supporting the delivery of wind farm equipment through the Confiscated Port and to the Herradura Wind Farm Project. Energoimport describes itself as "in charge of guaranteeing the delivery . . . of the supplies necessary for the execution of investments, imports and exports, [and] the maintenance and operation of [Cuba's] National Electro-energy System."[10]

83.     In December 2013, a consortium composed of Goldwind International Holdings (HK) Ltd. ("Goldwind International") and Avic International Holding Corporation ("Avic")

---

[9]   *See* Raimundo Urrechaga, *Chinese technology helps Cuba build largest wind farm*, XINHUA, Jan. 22, 2018), http://www.xinhuanet.com/english/2018-01/22/c_136914462.htm.

[10]   UNE, *ENERGOIMPORT*, UNE: Unión Eléctrica, https://www.unionelectrica.cuenergoimport/ (last modified on Nov. 29, 2018).

entered into a commercial agreement with Energoimport to provide wind farm designs, equipment, supplies, technical support, operations, and maintenance for Herradura 1.

84.     As part of this agreement, Goldwind International agreed with Energoimport to supply Herradura 1 with, among other equipment, 34 customized units of its GW 77/1500 PMDD wind turbines.[11]  All of the wind turbines at Herradura 1 would originate from Goldwind International.

85.     On June 23, 2017, the Goldwind International-Avic consortium, in collaboration with the Cuban government, secured project financing from the Export-Import Bank of China and the China Export and Credit Insurance Corporation.

86.     By December 15, 2018, at least 11 of Goldwind International's wind turbines had arrived in Cuba for use at Herradura 1.[12]  As of July 11, 2019, at least 22 of these turbines had arrived at Herradura 1.[13]  Goldwind International arranged for the shipment of these 22 wind turbines to Cuba via the Confiscated Port.

---

[11]  *See* Goldwind International, GWI Quarterly Q2 2017, Volumes 8, 10, *available at* http://www.goldwindinternational.com/media/index.html#bro (last visited Dec. 27, 2020); Goldwind International, Goldwind Wins 51MW Wind Turbine Order in Cuba, Dec. 18, 2013, *available at* http://www.goldwindinternational.com/content/details_16_298.html?_sm_au_ =iVVKNjJT4S4QP54MFcVTvKQkcK8MG (last visited Dec. 27, 2020).

[12]  News of the arrival of these 11 wind turbines, and their shipment from the People's Republic of China, was reported by Radio Libertad—a local radio broadcaster in Puerto Padre, Cuba. Radio Libertad, *Primeros aerogeneradores de parques eólicos en Puerto Carúpano*, RADIO LIBERTAD (Dec. 15, 2018), http://www.radiolibertad.cu/2018/12/15/primeros-aerogeneradores-de-parques-eolicos-en-puerto-carupano-audio-galeria/.

[13]  News of the arrival of these 22 wind turbines was reported by the Cuban News Agency, a news outlet owned and operated by the Cuban government.  *See* Naily Barrientos Matos, *Avanzan en Las Tunas obras en el parquet eólico La Herradura Uno*, AGENCIA CUBANA DE NOTICIAS (July 11, 2019), *available at* http://www.acn.cu/medio-ambiente/46995-avanzan-en-las-tunas-obras-en-el-parque-eolico-la-herradura-uno.

87.     Goldwind's International's parent company, Xinjiang Goldwind Science & Technology Co., Ltd. ("Goldwind Science"), also participated directly in the Herradura Wind Farm Project by, among other things, shipping certain wind farm equipment to the Confiscated Port, by way of the United States, for use in the project, *see infra* paragraphs 114–42.

**B.      Overview of the Relevant Shipping Process**

    i.      <u>Hiring Carriers and Issuing Bills of Lading</u>

88.     To ship wind farm equipment by sea, one or more carriers are typically hired to handle transportation logistics that include, among other things, identifying and booking available space on a shipping vessel, operating the vessel itself, coordinating pickup and drop-off of the equipment, and planning the shipping route.

89.     There are two types of carriers:  those that operate shipping vessels (known as Vessel Operating Common Carriers ("VOCCs")), and those that do not (known as Non-Vessel Operating Common Carriers ("NVOCCs")).[14]  If an exporter hires an NVOCC to execute a shipment, that NVOCC must then engage a VOCC to charter space on and operate the vessel carrying the transported goods.  Together, the NVOCC(s) and VOCC(s) determine which vessels are able to hold and transport the relevant cargo; plan the voyage for the cargo from port of origin to port of destination; and provide operational and logistical support at all ports of entry.

90.     A "bill of lading" is a legal document issued by a carrier to a shipper that details, among other things, the cargo being shipped; the vessel carrying the cargo; the origin and destination of the cargo; the ports of lading and unlading (i.e., loading and unloading); and the

---

[14]  *See, e.g.*, 46 U.S.C. § 40102 (17)(A) (NVOCCs are common carriers that "do[] not operate the vessels by which the ocean transportation is provided.").

exporter, carrier, and consignee (i.e., recipient) of the cargo. The bill of lading is signed by both the carrier and the shipper.

91.     Where both an NVOCC and a VOCC are engaged for a shipment, there are two types of bills of lading. The "house" bill of lading is issued by the NVOCC (which is listed as "carrier") to the *actual* shipper of the cargo. The "master" bill of lading[15] is issued by the VOCC (which is listed as "carrier") to the NVOCC (which is listed as "shipper").

92.     At a shipment's origin, the bills of lading function as receipts verifying that the goods have transferred from the shipper to the NVOCC, and then from the NVOCC to the VOCC. At a shipment's destination, the bills of lading function as proof of title to the goods. Per industry practice, the consignee listed presents the house bill of lading to the carrier in order to secure release of the shipment and claim ownership.

93.     In general, and at all times, the cargo described in the house and master bills of lading must match the manifest records kept by the shipping vessel carrying the cargo.

94.     DSV acted as an NVOCC, and worked in concert with other NVOCCs and VOCCs, to deliver wind farm equipment to Energoimport via the Confiscated Port, for use in the Herradura Wind Farm Project. *See infra* paragraphs 108–59.

ii.     Complying with U.S. Trade Laws Other than Helms-Burton

95.     Consistent with the U.S. embargo on trade with Cuba, shipments to Cuba of goods containing U.S.-manufactured components must generally be authorized by the U.S. Department of Commerce's Bureau of Industry and Security ("BIS")[16] and the U.S. Department

---

[15] The "master" here refers to the master of the relevant shipping vessel.

[16] *See* 15 C.F.R. § 746.2 (requiring either a license or license exception to export items subject to the Export Administration Regulations to Cuba).

of the Treasury's Office of Foreign Assets Control ("OFAC").[17]  Such shipments require licenses from each agency if they are not already authorized under BIS and OFAC regulations.

96.     If an export license from BIS is obtained to cover a particular shipment of goods to Cuba, that shipment will also be authorized under OFAC regulations if those goods are exported *from* the United States.[18]  To invoke this OFAC authorization, shippers of foreign origin, Cuba-bound goods who have already secured an export license will often make an interim stop in the United States before proceeding to Cuba for delivery.

97.     Obtaining authorization from OFAC and/or BIS to ship goods to Cuba does not shield the participants of said shipment from Helms-Burton Act liability if they traffic in confiscated property in the process.

98.     DSV and its counterparties' attempt to secure OFAC and BIS authorization was an integral part of their scheme to deliver wind farm equipment to Energoimport via the Confiscated Port.  *See infra* paragraphs 108–10, 135, 153.

         iii.     Entering the United States to Make an Interim Stop

99.     A shipping vessel intending to enter a U.S. port carrying foreign-origin, Cuba-bound cargo must electronically submit information regarding such cargo to the U.S. Department of Homeland Security's Customs and Border Protection ("CBP") at least 24 hours before the cargo is picked up at the foreign port (hereinafter, a "Cargo Declaration").  *See* 19 C.F.R.

---

[17]  *See* 31 C.F.R. § 515.201 (generally prohibiting transactions involving the property of a Cuban national that also involve U.S. persons or property subject to U.S. jurisdiction).

[18]  *See* 31 C.F.R. § 515.533 ("All transactions ordinarily incident to the exportation of items from the United States, or the reexportation of items from a third country, to any person within Cuba are authorized, provided that . . . [t]he exportation or reexportation is licensed or otherwise authorized by the Department of Commerce. . . .").

§ 4.7(b)(2). An NVOCC must either itself submit the Cargo Declaration to CBP, or forward it to another NVOCC or VOCC to submit. *See id.* § 4.7(b)(3)(i).

100.     Those carriers that have registered with the National Motor Freight Traffic Association must use their unique Standard Carrier Alpha Code in their Cargo Declarations. *See* 19 C.F.R. § 4.7a(c)(2)(iii).

101.     A Cargo Declaration must also contain accurate information regarding the relevant bills of lading. *See id.* § 4.7a(c), (f).

102.     CBP authorization for a shipping vessel to enter the United States en route to Cuba does not shield the participants of the relevant shipment from Helms-Burton Act liability if they traffic in confiscated property in the process.

103.     DSV and its counterparties' attempt to secure CBP authorization for their shipments' interim stops in the United States was an essential part of their scheme to deliver wind farm equipment to Energoimport via the Confiscated Port. *See infra* paragraphs 111–12, 123, 135, 153.

       iv.     <u>Departing the United States After an Interim Stop</u>

104.     A shipping vessel intending to depart from a U.S. port to deliver foreign-origin cargo to Cuba must obtain clearance from CBP to do so. *See* 19 C.F.R. § 4.60(a).

105.     To obtain CBP clearance, shipping vessels must present a completed "Clearance Application" to the relevant CBP port director. 19 C.F.R. § 4.61(a). Such applications must include any relevant export licenses. Applications must also include a travel itinerary of the ports that will be visited after departure from the United States.[19]

---

[19] *See* 19 C.F.R. § 4.61(f) ("Clearance in order of itinerary. Unless otherwise provided in this section, every vessel bound for a foreign port or ports will be cleared for a definite port or ports in the order of its itinerary. . . .").

106.    CBP authorization for a shipping vessel to depart the United States for Cuba does not shield the participants of the relevant shipment from Helms-Burton Act liability if they traffic in confiscated property in the process.

107.    DSV and its counterparties' attempt to secure CBP authorization for their shipments' departures from the United States was an essential part of their scheme to deliver wind farm equipment to Energoimport via the Confiscated Port. *See infra* paragraphs 111–12, 138, 156.

C.    **Shipping U.S.-Based Equipment to the Herradura Wind Farm Project**

108.    DSV, in coordination with others, supported at least two wind farm equipment deliveries to Energoimport for use on Herradura 1, which were carried by shipping vessels the "BBC Moonstone" and the "BBC Jade." The ships stopped in the United States before unloading equipment at the Confiscated Port in early 2019. To carry out these deliveries, DSV and its associates took steps to satisfy the aforementioned U.S. trade law requirements (separate from the Helms-Burton Act), which were applicable due to the equipment's U.S. manufactured components. But taking these steps did not shield DSV and others against liability under the Helms-Burton Act; in fact, they were part and parcel of their commercial scheme to utilize the Confiscated Port.

109.    On April 17, 2018, BIS approved a license application for the export of this wind farm equipment to Cuba (the "Herradura Export License"). The Herradura Export License identifies "Goldwind" as the Purchaser and Approved End User, and "Energoimport" as an authorized ultimate consignee. The destination address is listed as "La Herradura 1, Playa Herradura, Las Tunas Province, Jesus Menendez, Cuba," which as mentioned is about 15 miles away from the Confiscated Port.

110.    While the Herradura Export License provided the requisite BIS authorization, shipping the relevant wind farm equipment to Cuba also required OFAC authorization.  DSV and its collaborators attempted to obtain OFAC authorization by orchestrating an interim stop in the United States.

111.    Because making an interim stop in the United States required clearance from CBP on both the entry into and departure from the United States, DSV and others worked together to obtain such clearances.

112.    On information and belief, DSV engaged in certain activities in support of the delivery of this wind farm equipment to the Confiscated Port, by way of the United States.  DSV called the U.S. Department of Commerce to discuss the Herradura Export License, which covered the BBC Moonstone and the BBC Jade shipments.  With respect to the BBC Moonstone in particular, DSV conferred with others on a compliance issue and also submitted the relevant Cargo Declarations to the CBP, *see infra* paragraphs 117–20, 123, without which the BBC Moonstone would have been prohibited from stopping in the United States.

113.    In addition to the aforementioned activities, DSV helped plan and implement a delivery of wind farm equipment by the BBC Moonstone to the Confiscated Port.  DSV agreed to implement an interim stop in the United States en route to the Confiscated Port, and facilitated the execution of the interim stop.  The intent by those involved was to comply with U.S. trade laws *other than* the Helms-Burton Act.  As detailed below, DSV provided transportation and logistics services in support of this shipment.

### D.    DSV's Role in the BBC Moonstone Voyage

114.    A commercial shipping vessel named the "BBC Moonstone," after a refueling stop in Florida, docked at the Confiscated Port in February 2019 and unloaded wind farm

equipment on behalf of Goldwind Science and another supplier of the Herradura Wind Farm

Project (hereinafter, the "BBC Moonstone Voyage").

i.   The Shippers and Carriers

115.   Goldwind Science (for the benefit of its subsidiary, Goldwind International)

arranged for the BBC Moonstone to deliver its wind farm equipment (the "Goldwind

Equipment") to Energoimport.  Another entity that agreed to provide equipment for the

Herradura Wind Farm Project also arranged for the BBC Moonstone to deliver its wind farm

equipment (the "Moonstone Equipment") to Energoimport.  Both the Goldwind Equipment and

the Moonstone Equipment would be unloaded at the Confiscated Port.

116.   DSV, DSV Ocean Transport, and DSV Air & Sea (together, the "DSV

Companies") acted as NVOCCs for the Goldwind Equipment and the Moonstone Equipment

deliveries at the Confiscated Port.

117.   Corporate affiliates BBC Chartering Carriers GmbH & Co. KG ("BBC Carriers"),

BBC Chartering Singapore Pte Ltd. ("BBC Singapore"), and BBC Chartering USA, LLC ("BBC

USA") acted as VOCCs for the Goldwind Equipment and the Moonstone Equipment deliveries

at the Confiscated Port.  These entities, and the company that owns the BBC Moonstone,

International Maritime Organization ("IMO") No. 9563732, are all part of a German-

headquartered network of companies known as the "Briese Group."

118.   On information and belief, Goldwind Science hired and paid DSV to deliver the

Goldwind Equipment to the Confiscated Port, and such hiring and payment was conducted

through one of DSV's offices located in the United States.

119.   On information and belief, DSV, in turn, hired and paid the Briese Group to carry

out the delivery on one of their ships, and for related ship operational and chartering services,

and such hiring and payment was conducted through one of DSV's offices located in the United States.

120.    DSV provided or otherwise supported the following services:  (a) determining the shipping route taken by the BBC Moonstone; (b) tracking, at all times, the location of the BBC Moonstone and the equipment onboard at all relevant stops; (c) handling logistics, such as those involving local government authorities like the CBP (or engaging third parties to do so); (d) coordinating with other DSV Companies, the Briese Group, Goldwind International, Goldwind Science, Energoimport, and any other relevant shippers, carriers, and consignees; (e) overseeing and troubleshooting the execution of the deliveries; and (f) engaging in any necessary transactions to implement the foregoing.

121.    Such services were also provided or otherwise supported by DSV Ocean Transport, DSV Air & Sea, BBC Carriers, BBC Singapore, BBC USA, Goldwind Science, and Goldwind International.

122.    On DSV's website, shippers like Goldwind Science and Goldwind International can utilize the "Track & Trace" function to "follow [their] shipments online from the moment [they] place the order to delivery at the final destination."[20]

123.    DSV submitted to CBP the Cargo Declarations for the Goldwind Equipment and Moonstone Equipment so that the BBC Moonstone would have clearance to enter the United States and dock at the Miami Seaport.  As set forth below, these Cargo Declarations include identifying information regarding, among other things, the relevant shippers, carriers, and cargo.

ii.    Goldwind Equipment's Cargo Declaration

---

[20]  DSV, *About DSV*, DSV GLOBAL TRANSPORT AND LOGISTICS, https://www.us.dsv.com/about-DSV (last visited Dec. 6, 2020).

124.    The Cargo Declaration regarding the Goldwind Equipment (the "Goldwind Declaration") submitted by DSV to the CBP states in relevant part:

| House Bill of Lading Number | DSVFHPR0023755 |
|---|---|
| Master Bill of Lading Number | BBHYTIACAR002 |
| Cargo | Blade Root Frames & Tip Frames |
| Vessel | BBC Moonstone |
| Shipment Origin | China |
| Shipment Destination | Miami, Florida |
| Port of Lading | Tianjin, China |
| Port of Unlading | Miami Seaport; Miami, Florida |
| Shipper | Goldwind Science |
| Consignee | Energoimport[21] |
| Carrier | DSVF |

125.    DSV is registered under the Standard Carrier Alpha Code "DSVF."  Indeed, on its website, DSV identifies "DSVF" as its "NVOCC SCAC Code."[22]

126.    Given that the Goldwind Declaration identifies DSVF as the carrier, and DSVF is the prefix of the house bill of lading number, DSV was the NVOCC officially named responsible for this shipment of the Goldwind Equipment.

127.    BBC Carriers is registered under the Standard Carrier Alpha Code "BBHY." Given that the Goldwind Declaration displays BBHY as the prefix of the master bill of lading number, BBC Carriers was the VOCC officially named responsible for this shipment of the Goldwind Equipment.

---

[21]  The Goldwind Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

[22]  DSV, *Fact Sheet*, DSV GLOBAL TRANSPORT AND LOGISTICS, https://www.us.dsv.com/about-DSV/press/fact-sheet (last visited Dec. 6, 2020).

128.   The Goldwind Declaration falsely states the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[23] Although the cargo stopped in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraph 136-39.

iii.   Moonstone Equipment's Cargo Declaration

129.   The Cargo Declaration regarding the Moonstone Equipment (the "Moonstone Declaration") submitted by DSV to the CBP states in relevant part:

| | |
|---|---|
| House Bill of Lading Number | DSVFHPR0023752 |
| Master Bill of Lading Number | BBHYTIACAR001 |
| Vessel | BBC Moonstone |
| Shipment Origin | China |
| Shipment Destination | Miami, Florida |
| Port of Lading | Tianjin, China |
| Port of Unlading | Miami Seaport; Miami, Florida |
| Consignee | Energoimport[24] |
| Carrier | DSVF |

130.   Given that the Moonstone Declaration identifies DSVF as the carrier, and DSVF is the prefix of the house bill of lading number, DSV was the NVOCC officially named responsible for this shipment of the Moonstone Equipment.

131.   Given that the Moonstone Declaration displays BBHY as the prefix of the master bill of lading number, BBC Carriers was the VOCC officially named responsible for this shipment of the Moonstone Equipment.

---

[23]  It is a violation of the applicable CBP regulations for a VOCC or NVOCC to transmit electronically any information or documentation that is "forged, altered, or false."  19 C.F.R. § 4.7a.

[24]  The Moonstone Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

132.    The Moonstone Declaration falsely states the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[25] While the cargo stopped in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraph 136-39.

iv.    Delivering the Goldwind and Moonstone Equipment to the Confiscated Port

133.    On December 24, 2018, the BBC Moonstone arrived in Tianjin, China, to pick up the Goldwind Equipment and the Moonstone Equipment.  The BBC Moonstone departed Tianjin on December 25, 2018, for the Panama Canal.

134.    On January 26, 2019, the BBC Moonstone arrived at the Panama Canal, and proceeded to travel to Florida.

135.    On January 30, 2019, the BBC Moonstone—carrying the Goldwind Equipment and Moonstone Equipment for receipt by Energoimport, a Cuban state-owned entity—entered the Miami Seaport.  Prior to that date, DSV electronically submitted to CBP the Goldwind Declaration and the Moonstone Declaration in order to clear the BBC Moonstone's entrance into the United States.

136.    None of the wind farm equipment for receipt by Energoimport was unloaded in Miami—in fact, while in Miami, no cargo on the BBC Moonstone was unloaded whatsoever.

137.    Instead, the BBC Moonstone "bunkered," meaning refueled and resupplied, at the Miami Seaport.  Refueling and resupplying the BBC Moonstone enabled it to immediately proceed to the Confiscated Port in Cuba to unload the wind farm equipment.

---

[25]  *See supra* note 23.

138.    Later that same day, on January 30, 2019, the BBC Moonstone departed the Port of Miami.  Prior to departure, CBP approved the BBC Moonstone's Clearance Application, which stated that the ship would proceed to Puerto Carupano in Cuba and then to Port Arthur in Texas.  Attached to the Clearance Application was the Herradura Export License.

139.    On February 4, 2019, the BBC Moonstone arrived at the Confiscated Port, and over the course of three days, unloaded the Goldwind Equipment and the Moonstone Equipment, delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project.  On information and belief, at or around the time of delivery, the relevant bills of lading were presented by Energoimport to the operators of the BBC Moonstone.

140.    On February 7, 2019, the BBC Moonstone departed the Confiscated Port for Port Arthur in Texas, and arrived in Port Arthur on February 10, 2019.  While at Port Arthur, the BBC Moonstone unloaded equipment which had been picked up prior to stopping in Tianjin on December 24, 2018 (the "BBC Equipment").  The BBC Equipment was delivered to BBC USA on behalf of its parent company BBC Chartering & Logistic GmbH & Co. KG ("BBC Chartering").

141.    On February 17, 2019, the BBC Moonstone departed Port Arthur.

142.    In sum, and in relevant part, the BBC Moonstone (1) stopped in Tianjin, China, to pick up the wind farm equipment for receipt by Energoimport; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, to refuel and resupply; (4) stopped at the Confiscated Port in Cuba to unload the wind farm equipment; and (5) stopped in Port Arthur, Texas, to unload the BBC Equipment.  These events are depicted in Figure 1 below.



| | Port of Call | Date(s) | Action Taken |
|---|---|---|---|
| 1 | Tianjin, China | Dec. 25, 2018 (Departure) | Loaded Goldwind Equipment and Moonstone Equipment |
| 2 | Panama Canal | Jan. 26, 2019  (Arrival and Departure) | Passage |
| 3 | Miami, Florida | Jan. 30, 2019  (Arrival and Departure) | Refueled and resupplied |
| 4 | Puerto Carupano, Cuba (the Confiscated Port) | Feb. 4, 2019 (Arrival) – Feb. 7, 2019 (Departure) | Unloaded Goldwind Equipment and Moonstone Equipment |
| 5 | Port Arthur, Texas | Feb. 10, 2019 (Arrival) | Unloaded BBC Equipment (which had been loaded prior to Tianjin) |

*Figure 1: BBC Moonstone Voyage*

### E.   DSV's Role in the BBC Jade Voyage

143.   A commercial shipping vessel named the "BBC Jade," after a refueling stop in Florida, docked at the Confiscated Port in January 2019 and unloaded wind farm equipment on behalf of a supplier of the Herradura Wind Farm Project (hereinafter, the "BBC Jade Voyage"). The BBC Jade, IMO No. 9421116, is owned by a Briese Group entity.

### v.   The Shippers and Carriers

144.   A supplier—not Goldwind Science or Goldwind International—arranged for the BBC Jade to deliver its wind farm equipment (the "Jade Equipment") to Energoimport via the Confiscated Port.

145. DSV Ocean Transport and DSV Air & Sea acted as the NVOCCs for the Jade Equipment delivery at the Confiscated Port. DSV discussed the Herradura Export License—which supported the Jade Equipment delivery—with the U.S. Department of Commerce, *see supra* paragraph 112.

146. The Briese Group, and specifically BBC USA, BBC Chartering, BBC Carriers, and BBC Singapore, acted as VOCCs for the Jade Equipment delivery at the Confiscated Port.

     vi.   Jade Equipment's Cargo Declaration

147. The Cargo Declaration regarding the Jade Equipment (the "Jade Declaration") submitted to the CBP states in relevant part:

| Bill of Lading Type | House |
|---|---|
| Bill of Lading Number | DFDSHPR0023522 |
| Vessel | BBC Jade |
| Shipment Origin | China |
| Shipment Destination | Miami, Florida |
| Port of Lading | Tianjin, China |
| Port of Unlading | Miami Seaport; Miami, Florida |
| Consignee | Energoimport[26] |
| Carrier | DFDS |
| Master Bill of Lading Number | BBCHTIAPUE002 |

148. DSV Ocean Transport is registered under the Standard Carrier Alpha Code "DFDS." Given that the Jade Declaration identifies DFDS as the carrier, and DFDS is the prefix of the house bill of lading number, DSV Ocean Transport was the NVOCC officially named responsible for this shipment of the Jade Equipment.

149. BBC Chartering is registered under the Standard Carrier Alpha Code "BBCH." Given that the Jade Declaration displays BBCH as the prefix of the master bill of lading number,

---

[26] The Jade Declaration refers to Energoimport by its full name, "Empresa Importadora-Exportadora de Objetivos Electro-Energéticos."

BBC Chartering was the VOCC officially named responsible for this shipment of the Jade Equipment.

150.    The Jade Declaration falsely states the shipment destination and port of unlading as Miami, Florida, and the Miami Seaport, respectively—in violation of U.S. law.[27]  While the cargo stopped in Miami, the true shipment destination was Cuba, and the true port of unlading was the Confiscated Port, *see infra* paragraph 154-57.

vii.    Delivering the Jade Equipment to the Confiscated Port

151.    On November 13, 2018, the BBC Jade arrived at Tianjin, China, picked up the Jade Equipment, and departed two days later on November 15, for the Panama Canal.

152.    On December 25, 2018, the BBC Jade arrived at the Panama Canal, traveled through it, and departed the next day, December 26, heading toward Florida.

153.    On December 30, 2019, the BBC Jade—carrying the Jade Equipment for receipt by Energoimport, a Cuban state-owned entity—entered the Miami Seaport.  Prior to that date, the Jade Declaration was electronically submitted to CBP to clear the BBC Jade's entrance into the United States.

154.    The Jade Equipment was not unloaded in Miami—in fact, while in Miami, no cargo on the BBC Jade was unloaded whatsoever.

155.    Instead, the BBC Jade "bunkered," meaning refueled and resupplied, at the Miami Seaport.  Refueling and resupplying the BBC Jade enabled it to immediately proceed to the Confiscated Port in Cuba to unload the Jade Equipment.

156.    On December 31, 2018, the BBC Jade departed Miami for the Confiscated Port. Prior to departure, CBP approved the BBC Jade's Clearance Application, which stated that the

---

[27]  *See supra* note 23.

ship would proceed to Puerto Carupano in Cuba.  Attached to the Clearance Application was the Herradura Export License.

157.    On January 6, 2019, the BBC Jade arrived at the Confiscated Port, and over the course of three days, unloaded the Jade Equipment—delivering it to Energoimport for transportation by road to the Herradura Wind Farm Project.  On information and belief, at or around the time of delivery, the relevant bills of lading were presented by Energoimport to the operators of the BBC Jade.

158.    On January 9, 2019, the BBC Jade departed the Confiscated Port.

159.    In sum, and in relevant part, the BBC Jade (1) stopped in Tianjin, China, to pick up the Jade Equipment; (2) passed through the Panama Canal; (3) stopped in Miami, Florida, to refuel and resupply; and (4) stopped at the Confiscated Port in Cuba to unload the Jade Equipment.  These events are depicted in Figure 2 below.



*Figure 2: BBC Jade Voyage*

## FIRST CAUSE OF ACTION
### Trafficking in Confiscated Property in Violation of 22 U.S.C. § 6082

160.   American Sugar incorporates by reference paragraphs 1 through 159 as though fully set forth herein.

161.   Title III of the Helms-Burton Act provides that any person who "traffics" in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any U.S. national who owns the claim to such property for monetary damages.  22 U.S.C. § 6082(a)(1).

162.    American Sugar is incorporated in New Jersey with its principal place of business in New York, and is thereby a "United States National" under the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

163.    As a "United States National," American Sugar is entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban government on or after January 1, 1959."  22 U.S.C. § 6082(a)(1).

164.    As detailed in this complaint, the Confiscated Property was expropriated by Cuba on or after January 1, 1959.

165.    American Sugar's certified claim is "conclusive proof of ownership" of American Sugar's interest in the Confiscated Property.  22 U.S.C. § 6083(a)(1).

166.    The certified loss of $97,373,414.72 in American Sugar's certified claim is the presumed amount a trafficker in the Confiscated Property owes American Sugar under Title III of the Helms-Burton Act, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(a)(2).  That presumption is only "rebuttable by clear and convincing evidence."  *Id.*

167.    A trafficker in the Confiscated Property is liable to American Sugar for compounded interest on the presumed amount, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(3)(A) & (3)(C); 22 U.S.C. § 6082(a)(1)(A).

168.    DSV "knowingly and intentionally":  (1) "use[d]" the Confiscated Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person.  22 U.S.C. § 6023(13)(A).

169.     Specifically, DSV intentionally used, trafficked in, and benefited from the Confiscated Port and caused others to use, traffic in, and benefit from the Confiscated Port by providing services related to the export license supporting the BBC Moonstone Voyage and the BBC Jade Voyage.  For both voyages, DSV knew or had reason to know that the relevant wind farm equipment would be unloaded at the Confiscated Port, by way of the United States.  In providing the aforementioned services, DSV acted in concert with its corporate affiliates DSV Air & Transport and DSV Ocean Transport; with the Briese Group; with Goldwind Science and Goldwind International; and with Energoimport.

170.     DSV also intentionally trafficked in, and benefited from the Confiscated Port and caused others to use, traffic in, and benefit from the Confiscated Port by providing transportation and logistics services in support of the BBC Moonstone Voyage.  In doing so, DSV knew or had reason to know that the relevant wind farm equipment would be unloaded at the Confiscated Port, by way of the United States.  In providing the aforementioned services, DSV acted in concert with its corporate affiliates DSV Air & Transport and DSV Ocean Transport; with the Briese Group; with Goldwind Science and Goldwind International; and with Energoimport.

171.     With respect to the BBC Moonstone Voyage, DSV also intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via the United States) by its corporate affiliates DSV Air & Transport and DSV Ocean Transport; by the Briese Group; by Goldwind Science and Goldwind International; and by Energoimport.

172.     With respect to the BBC Jade, DSV also intentionally and knowingly directed, caused, participated in, and profited from the use of, trafficking in, and commercial benefiting from the Confiscated Port (via the United States) by its corporate affiliates DSV Air & Transport

and DSV Ocean Transport; by the Briese Group; by Goldwind Science and Goldwind International; and by Energoimport.

173.    At no point in time did DSV use or benefit from the Confiscated Property with the authorization of American Sugar.  *See* 22 U.S.C. § 6023(13).

174.    DSV engaged in unlawful trafficking after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996.  *See* 22 U.S.C. § 6082(a)(1)(A).

175.    Therefore, American Sugar is entitled to damages in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, attorneys' fees, costs, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## SECOND CAUSE OF ACTION
### Civil Conspiracy Under New Jersey Law

176.    American Sugar incorporates by reference paragraphs 1 through 175  as though fully set forth herein.

177.    DSV agreed with DSV Ocean Transport, DSV Air & Sea, the Briese Group, Goldwind Science, and Goldwind International to transport wind farm equipment from China to Energoimport in Cuba via the Confiscated Port, in violation of the Helms-Burton Act.

178.    DSV, and its counterparties, knew that the wind farm equipment was to be delivered to Energoimport at the Confiscated Port in Cuba via two shipping vessels:  the BBC Moonstone and the BBC Jade.

179.    DSV, and its counterparties, were aware that the shipment of wind farm equipment to Energoimport at the Confiscated Port would subject them to the risk of liability or penalties under the Helms-Burton Act.

180.   In order to further their conspiracy, DSV and its counterparties implemented a scheme whereby the BBC Moonstone and the BBC Jade stopped in the United States en route to the Confiscated Port, in order to comply with U.S. trade law requirements other than the Helms-Burton Act.  DSV and its counterparties coordinated the logistics required by a stop in the United States, including obtaining clearance from the CBP to enter and leave the United States.

181.   The stopovers of the BBC Moonstone and the BBC Jade in the United States were essential aspects of DSV's and its counterparties' use of the Confiscated Port in violation of the Helms-Burton Act.

182.   DSV, for its part, aided in the scheme to transport wind farm equipment from China to Energoimport in Cuba by:  (1) coordinating and executing the BBC Moonstone's route through the United States to the Confiscated Port; (2) providing logistics services in relation to this stopover in the United States, including the submission of the Goldwind Declaration to CBP; and (3) engaging in activities related to the Herradura Export License, which covered both the BBC Moonstone Voyage and the BBC Jade Voyage.

183.   As a result of the aforementioned acts as part of their conspiracy, DSV and its counterparties successfully trafficked in the Confiscated Port, without authorization from, or compensation to, American Sugar.

184.   Therefore, American Sugar is entitled to damages from DSV in the amount of the certified claim, plus applicable pre-judgment interest.  American Sugar is also entitled to treble damages, court costs, reasonable attorneys' fees, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1), (3); 28 U.S.C. § 1961.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, American Sugar demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, American Sugar respectfully requests that judgment be entered in its favor and against DSV:

1. Awarding American Sugar actual damages in the amount of the certified claim, namely $97,373,414.72;

2. Awarding American Sugar pre-judgment compounded interest pursuant to 22 U.S.C. § 6082(a)(1)(B) accruing from the relevant dates of confiscation;

3. Awarding American Sugar treble damages pursuant to 22 U.S.C. § 6082(a)(3);

4. Ordering DSV to pay American Sugar's reasonable attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a)(1)(A)(ii);

5. Awarding American Sugar post-judgment interest pursuant to 28 U.S.C. § 1961; and

6. Granting all other relief that the Court deems just and proper.

Dated:  January 4, 2021                          Respectfully submitted,

                                                  /s/ Marshall R. King_____

Miguel A. Estrada (*pro hac vice* application     Marshall R. King (N.J. Bar No. 023301991)
forthcoming)                                          *Attorney of Record*
Audi K. Syarief (*pro hac vice* application       Andrea E. Neuman (*pro hac vice* application
forthcoming)                                      forthcoming)
GIBSON, DUNN & CRUTCHER LLP                       Rahim Moloo (*pro hac vice* application
1050 Connecticut Avenue, NW                       forthcoming)
Washington, DC 20036-5306                         Casey Kyung-Se Lee (*pro hac vice* application
Telephone:  (202) 955-8257                        forthcoming)
Facsimile:  (202) 530-9616                        GIBSON, DUNN & CRUTCHER LLP
mestrada@gibsondunn.com                           200 Park Avenue
                                                  New York, NY 10166-0193
                                                  Telephone:  (212) 351-3905
                                                  Facsimile:  (212) 351-5243

mking@gibsondunn.com
aneuman@gibsondunn.com
rmoloo@gibsondunn.com
clee@gibsondunn.com

*Counsel for Plaintiff North American Sugar Industries Inc.*